UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID A. JONES,

    Plaintiff,

    vs.

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.

CIVIL ACTION NO. 04-74786

HONORABLE ARTHUR J. TARNOW
HONORABLE STEVEN J. PEPE

_____/

**REPORT AND RECOMMENDATION**

**I.**    **BACKGROUND**

This is an action seeking judicial review pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). See 42 U.S.C. §§ 416(I), 423(d), 1381a, 1382c.

Plaintiff applied for DIB and SSI on July 16, 2002 (R. 40-42), alleging he became disabled on June 13, 1999, from injuries sustained when an automobile hit him while riding a bicycle (R. 40, 50). His claims were denied administratively (R. 26-29, 228-31), and, on March 31, 2004, Administrative Law Judge (ALJ) Gilbert Sheard held a hearing. Plaintiff, who was not represented, appeared and testified, as did his father, and a vocational expert (R. 233 - 58). On June 25, 2004, ALJ Sheard issued a decision finding Plaintiff not disabled (R. 12-22).

1

A.    **Procedural History**

**STATEMENT OF THE FACTS**

Plaintiff was born in 1964 and was 37 years old on December 31, 2001, when his insured status expired (R. 20, 22, 40).  He  had a high school education and  past relevant work as a service station manager, construction laborer, and dock worker (R. 56, 93).

B.    **Background Facts**

1. **PLAINTIFF'S TESTIMONY**

At the hearing on March 31, 2004, Plaintiff testified that on a typical day his activities are limited.  Plaintiff moves from the sofa to the chair; occasionally walks up and down the street; visits his father next door; occasionally goes to the garage but has to take breaks by lying down or stretching in his recliner.  (R. 235, 242).

The Plaintiff testified that he has trouble standing and lifting (R. 242).  In addition, he has a difficult time sitting down, which he can only do so for a few hours (R. 236).  When he sits his shoulder and back hurt, although sometimes he has pain from nothing in particular (R. 236, 237). When the Plaintiff uses the computer, his leg, arm, and hand become numb and his neck hurts.  He testified that this neck pain will often turn into migraine headaches.  (R. 236).  The Plaintiff still has problems with his right knee that fluctuates depending on how much he is "on it." He has had a problem with swelling, and his ankle has been hurting him ever since the accident.  (R. 237).  The pain in his ankle shoots from his knee to his ankle.  This pain causes a "constant limp" and "feels like a hammer hit me in the leg."  (R. 241).  Plaintiff has pain in both his upper and lower back.  This lower back pain is constant, radiating to his right legs and hips.  He described the pain as "really bad," particularly in the morning or if he has to sit for an extended period.  (R. 239).

His pain in his shoulder, arm, and neck comes and goes and he describes the shoulder and neck pain as "extreme."  The pain shoots out through his right arm and he described it as an "odd feeling like something's being pulled from your hand clear up through your biceps." (R. 237).  The pain makes doing the dishes, vacuuming, brushing his teeth, and generally cleaning the house very difficult for the Plaintiff.  (R. 239).

For pain relief, Plaintiff takes Darvocet, uses a neck brace/heat massager and a massager with rollers.  When asked by ALJ Sheard if using such a device at lunch would be helpful, the Plaintiff said that it would help but that he did not think he could "go for that amount of time" (the four hours between the start of the work day and his lunch break).  (R. 238).  The Darvocet does help his pain in his ankle but the relief is not long lasting.  Rather, he gets relief from stretching his ankle out in a recliner and putting a heating pad or an ice pack on it.  (R. 241 - 242).  In addition, the Plaintiff has a spinal epidural and a spinal block once every six months for his back although he says that it does not help his lower back.  For more relief of his lower back pain, Plaintiff will lie flat on the floor.  (R. 240).  Plaintiff testified that he does not do the therapy exercises that his doctor gave to him often because "it hurts the knee a great deal and it really doesn't help stretch the back out." (R. 242).  Plaintiff also noted that he has been told to discontinue his physical therapy because there is nothing more that can be done.  (R. 242).

At the hearing, Vocational Expert Stephanee Leech briefly described the sedentary jobs of production inspector and clothing inspector (R. 243).  Both of these types of jobs would allow the worker to sit and stand at will (R. 244).

ALJ Sheard then asked Plaintiff if he would be able to work as a clothing inspector (R. 244).  Plaintiff answered that he would have trouble raising his hands to hold the clothing up.  It would be

impossible to work for forty hours a week because he had trouble folding one load of laundry due to his neck and shoulder pain (R. 244-45). Plaintiff explained that he loves to work and would like to earn money. He supported this contention by pointing to the fact that he worked while incarcerated, unlike many inmates, who did not.

Plaintiff testified that he had not had any mental examinations since his accident (R. 248). Upon ALJ Sheard's questioning, Plaintiff stated that there was enough evidence to show that the pain was not "all in his head" and that he was actually suffering legitimate physical ailments. Plaintiff observed that he has overcome many pains in his life, and has no doubt that he would overcome these pains if it were possible to do so. (R. 248).

Plaintiff said that, on an average day, he would be able to stand for at least one hour (R. 248). The Plaintiff said that he wants a job where he could alternate sitting, standing, and lying down. (R. 239).

### 2. MEDICAL EVIDENCE

On June 13, 1999, Plaintiff was hospitalized after an automobile hit him while riding a bicycle (R. 121, 131). Plaintiff had a right fibular fracture, partial separation of the AC joint, and abrasions of the face (R. 121). A CT scan showed evidence of asymmetric lucency in the right posterior fossa that may be consistent with either an asymmetric magnus, cisterna magna or possible right posterior fossa subarachnoid cyst (R. 121). X-rays showed some narrowing of the C5 disc with some degenerative spurring seen at the C5 and C6 levels with no evidence of any fractures. Mild degenerative changes occurred at the C5 and C6 levels (R. 133). The X rays also showed a fracture of the nasal bones with some soft tissue swelling (R. 135). A CT scan of the head showed some soft tissue swelling over the scalp and right orbit with no acute intracranial abnormality. It also showed

4

either a variant of a cisterna magna which is predominantly right sided or possibly an arachnoid cyst or area of porencephaly, which is less likely. Either way the finding is believed to be long standing. (R. 132).

On June 15, Thomas O'Neil, M.D., a consulting neurologist, saw Plaintiff who reported a mild concussion as a child (R. 121). Otherwise, Plaintiff had a normal neurological examination (R. 122). Dr. O'Neil concluded that abnormality on the CT scan appeared unrelated to the current injury and was probably a benign variant. The episodic left upper extremity paresthesias prior to the injury suggested carpal tunnel syndrome, but, since the accident, these paresthesias were somewhat increased and associated with left neck pain. Therefore, there was a possibility of mild cervical radiculopathy, so Dr. O'Neil ordered a follow-up CT scan of the head, which turned out to be unchanged from the prior CT exam (R. 122, 123).

On June 25, 1999, Dr. O'Neil reported that Plaintiff had intact strength, sensation, and reflexes in his upper left extremity and that he was following Dr. Mendelson's orders regarding his fractured right fibula and his right shoulder separation. (R. 165). In January 2000, Dr. O'Neil noted an EEG and an EMG of his upper left extremity, were both normal. Plaintiff reported some symptoms of paresthesias in the left arm, but other than that the examination by Dr. O'Neil was unchanged. (R. 164).

Plaintiff saw Jeffrey D. Mendelson, M.D., an orthopedic surgeon, thirteen times from June 1999 to August 2000 (R. 139 - 63). On June 17, 1999, Dr. Mendelson's impression was a fractured right leg that was healing, a cervical strain, a left shoulder strain, and a right A-C joint separation. He thought the numbness and some of the neck pain was myofascial strain (R. 163). Plaintiff visited

5

Dr. Mendelson twice more in July, before he was scheduled for an arthroscopic examination.  (R. 159 - 162, 168).

In August 1999, Dr. Mendelson performed arthroscopic surgery to repair tears of the anterior cruciate ligament and medial and lateral meniscus of Plaintiff's right knee (R. 119-20).  Dr. Mendelson's examination of the patellofemoral joint showed a small area of chondromalacia, Grade II, on the under surface of the patella (R. 119)[1].  On his first visit with Dr. Mendelson after surgery, Plaintiff acknowledged that his knee was feeling stronger and that he could fully straighten his leg. Dr. Mendelson described the joint as stable and the wound as healing well.  (R. 157).  In September 1999, Plaintiff said his preoperative pain was gone, and most of his pain was between his shoulder blades and around the left shoulder and neck (R. 155).  He had a full range of motion of the neck, some tenderness on palpation in the infrascapular region, but negative impingement maneuvers in both shoulders.  X-rays of the knee showed healing, x-rays of the shoulders were normal; and x-rays of the neck showed mild anterior spur formation at C5-6.  Dr. Mendelson thought Plaintiff was making excellent progress with his knee, but needed to continue physical therapy on his shoulder and remain off work until then.  (R. 155 - 56).  In October 1999, Plaintiff said his biggest problem was pain behind the left shoulder and between the scapuli (R. 153).  Plaintiff still had full cervical range of motion with tenderness over the A-C joint on the right, and paraspinal tenderness in the mid thoracic and lower cervical regions.  The left shoulder examination showed minimal impingement

---

[1]Dr. Mendelson goes on describing the surgery and his examination: "With the Mitek vapor, a thermal ablation and chondroplasty was performed.  Medial joint space was inspected and there was noted to be a moderate amount of synovitis and a synovectomy was performed here.  There was a tear off the anterior horn of the medial meniscus... .  The lateral joint space revealed there to be some Grade III chondromalacia on the lateral tibial plateau and a thermal ablation and chondroplasty were performed here as well.  Some fraying of the lateral meniscus was encountered and this was trimmed back with the Mitek vapor as well. ...A thermal electric shrinkage and repair of the anterior cruciate ligament was then carried out, resulting in significant improvement."  (R. 119 - 120).

type pain.  Dr. Mendelson believed the pain between the scapuli was myofascial, and he recommended anti-inflammatory medication and physical therapy.  He advised Plaintiff to remain off work.  (R. 153 - 54).  The November 4, 2005, exam revealed pain in the Plaintiff's neck and left shoulder, inflamation of the right shoulder, with improvement in the A-C joint, and the right knee doing well.  Dr. Mendelson advised Plaintiff to remain out of work, pending reevaluation at his next visit.  (R. 151 - 52).  On a November 18 visit, an MRI of the shoulder was normal, and a neck MRI showed mild cervical spondylosis.  Dr. Mendelson again restricted the Plaintiff from working and wanted him to try Vioxx (R. 149 - 50).

In February 2000, Dr. Mendelson observed that Plaintiff had mild tenderness on paraspinal palpation in the cervical region, but impingement maneuvers in both shoulders were normal, and he had a full range of motion in his shoulders, cervical spine and right knee (although the knee had minimal tenderness) (R. 144).  X-rays showed the fracture of the right knee had healed without arthritic changes (R. 145).  Shoulder x-rays showed minimal arthritis in the A-C joints, and cervical films showed slightly decreased disc space at C5-6 with anterior spur formation (R. 145).  Plaintiff had cervical spondylosis, bilateral A-C joint arthritis, a right rotator cuff strain, and a healed right tibia/fibula fracture.  Dr. Mendelson thought the neck and shoulder pain was mostly myofascial.  (R. 145) Plaintiff was to remain off work, and Dr. Mendelson would determine the Plaintiff's ability to return to work on March 30, 2000, his next visit.  (R. 146).

On his March 30, 2000, visit, Plaintiff complained of knee pain (R. 141).  An MRI of his thoracic spine showed some degeneration and desiccation of the T7-8 region and x-rays of his right knee showed no evidence of fracture or arthritis.  Dr. Mendelson's impression was a right knee strain with medial joint line pain and myofascial pain in the neck and back.  He noted that it had

been nine months since the accident, but that he expected further improvement and full improvement by 18-24 months after the accident (R. 141). Plaintiff was to remain off work, and he would determine Plaintiff's ability to return to work at his next visit, scheduled for May 11, 2005 (R. 143). At that visit, Plaintiff had persistent right knee pain (R. 140). In August 2000, Dr. Mendelson reported that a recent MRI revealed some myoxid degenerative changes involving the meniscus and effusion in the knee, and given the longstanding complaints, Dr. Mendelson again discussed a repeat arthroscopic procedure (R. 139). The A-C separation of the right shoulder had resolved, but Plaintiff complained of pain in both shoulders, his neck, and back with no obvious radiculopathy seen by EMG or MRI (Plaintiff also complained of pain in his right knee). Plaintiff's prognosis was good, and Dr, Mendelson expected improvement in his neck, shoulders, and back. (R. 139).

From November 1999 to May 2000, Plaintiff was also seeing physiatrist Mark F. Rottenberg, M.D (R. 177-83). In a medical report discussing Plaintiff's visits, Dr. Rottenberg noted a positive Lhermitte's sign, a positive left Spurling's test, and trigger points in the left sternocleidomastoid, left trapesius muscles, and left rhomboids. Dr. Rottenberg also noted a positive left hyperabduction thoracic outlet test, some tenderness over the right A-C joint, instability in the right knee with a positive anterior drawer's sign, some crepitus in the right knee, a positive medial McMurray's compression test and weakness in the vastus medialis muscle on the right. A neurological exam revealed decreased pinprick in the left ulnar nerve distribution with a positive left Tinel's at the elbow. (R. 178). Dr. Rottenberg indicated that on a November 18 visit, electrodiagnostic testing revealed evidence of a left ulnar neuropathy with compression at the elbow on nerve conduction testing and a mild C5 cervical radiculopathy (R. 179). Somatosensory evoked potential testing in the upper extremities was consistent with a mild cervical cord conduction delay. Dr. Rottenberg's

impression was neck pain with disc pathology and degenerative changes and mild left radiculopathy, a cervical strain and myofascial pain; back pain with a thoracic strain; right should pain with a right A-C sprain and right shoulder impingement syndrome with rotator cuff tendinitis; right knee pain with right knee sprain and prior right knee arthroscopic surgery with suspected partial tear of the medial meniscus; left ulnar neuropathy with compression at the elbow; and left hyperabduction type thoracic outlet syndrome.  (R. 179).  In his August 2000 medical report discussing the Plaintiff's visits to his office, Dr. Rottenberg wrote that Plaintiff "was disabled from competitive employment from the time of his initial visit through the time of his last visit on May 9, 2000."  (R. 180).

    More than two years later, in  September 2002[2], Dr. Lele, an orthopedic surgeon, performed a consultative examination at the request of the state agency (R. 203-08).  Dr. Lele reported that Plaintiff stated that some days his right shoulder was fine, and some days he had trouble, indicating that he could not put his right arm behind his back (R. 203).  He complained of stiffness and pain in his neck with pain radiating down his right arm and between his shoulder blades, causing numbness down the right arm, as well as pain and soreness in his right knee.  He has attended physical therapy for his neck and knee and he noted that his sleep has been disturbed because of the pain.  Plaintiff stated that he had received no treatment during the past two years, as he had been incarcerated due to drunken driving.  Plaintiff stated that he took Tylenol and Tylenol PM regularly. He had previously taken Vicodin, Vioxx, Celebrex, and Skelaxin, but no longer did so due to his substance abuse problem.  (R. 204).

---

    [2]Dr. Lele writes in the body of his letter that he examined the Plaintiff on September 12, 2001, yet the letter itself is dated September 12, 2002 as is the signature page of the accompanying range of motion chart.  (R. 203 - 08).

9

On examination, Plaintiff could get off the chair and examination table without discomfort (R. 204). He stood erect and walked without a limp. He could stand on his toes and heels and squat 50 percent with right knee pain. His cervical range of motion was full on flexion and somewhat limited at extension, lateral flexion and rotation. (R. 204 - 05). In the lumbar spine, forward flexion was limited, but extension and left and right flexion were normal. He complained of lower back pain, but had no muscle spasm or local tenderness. (R. 205) Dr. Lele did not find significant pathology (R. 206).

Also in late 2002, Plaintiff saw Alexander Iwanow, M.D., a specialist in physical medicine (R. 221 - 223). Plaintiff reported that his year and one-half of physical therapy had helped some, but that he continued to have chronic pain but reported no new injuries. (R. 221). Plaintiff reported that he had spent time in jail since his injury. (R. 221). On examination, Dr. Iwanow rated Plaintiff's upper limb strength as 4 out of 5 and noted that Plaintiff's cervical range of motion was 90 degrees to either side, normal for extension, and three-quarters normal for flexion. Cubital tunnel testing showed numbness in his right outer two fingers. The Plaintiff complained of lower back pain when he did a half squat and tenderness and swelling around the right ankle and foot was noted. (R. 221 - 222). Dr. Iwanow's impression was post-traumatic left thoracic outlet syndrome with ongoing pain in the left shoulder; post-traumatic cubital tunnel syndrome on the right, symptoms persistent; post-traumatic lower back pain with ongoing symptoms; post-traumatic right knee pain, probably a meniscal injury; and post-traumatic ankle and foot pain (R. 222). He noted Plaintiff was using over the counter medications which were "fine" and he did not write any prescriptions "as per his request." (Id.). Dr. Iwanow indicated that Plaintiff seemed to not be employable but that he wanted to work with the patient more before making that decision effective.

10

Electrodiagnostic testing in December 2002 of Plaintiff's right arm confirmed carpal tunnel syndrome that Dr. Iwanow did not believe was related to Plaintiff's accident and showed that he may have some ulnar sensory abnormalities (R. 220). At the same visit, a bone scan revealed some increased uptake in the distal right tibia at the ankle. There were no abnormalities in the back but ultrasound studies showed right chronic supraspinatus tendinitis and acromioclavicular joint arthritis.

On a January 2003, visit to Dr. Iwanow, Plaintiff complained of continued pain in his neck and shoulders and Dr. Iwanow suspected that the Plaintiff suffered from thoracic outlet syndrome bilaterally, more neurongenic on the right and more vascular on the left. (R.219). After another physical exam, Dr. Iwanow noted that he wanted to send the Plaintiff to Physical Therapy in an effort to stretch out his neck and shoulder problems. Dr. Iwanow prescribed Darvocet and Trazodone. (R. 219). Dr. Iwanow noticed some issues with Plaintiff's right eye and noted that Plaintiff complained of occasional blurry vision.

In March, 2003, Dr. Iwanow stated that Plaintiff was not to work until a functional capacity evaluation was performed (R. 217)[3]. Plaintiff complained to Dr. Iwanow about increased lower back pain, as well as neck and shoulder pain (R. 217). A physical examination showed increased uptake in Plaintiff's ankle. (R. 217).

In June 2003, Stanley Sczecienski, D.O., performed a consultative examination (R. 104-17). Plaintiff reported that he was experiencing back pain, minimal knee pain, but denied any radiculopathy. He also stated that he had pain in his neck that went up into his head and behind his

---

[3]There is no indication in the record that the suggested functional capacity evaluation was ever completed.

11

right eye.  He walked with a limp in his left leg although when he discussed this pain he pointed to

his right leg.  At the time, Plaintiff was taking Darvocet N-100, one to four pills a day; one or two

Celebrex every day; a sleeping pill as needed; and over-the-counter Tylenol.  (R. 107).  Plaintiff

denied the use of alcohol but smokes cigarettes (less than one-half pack a day). (R. 109).  At the end

of the discussion about his history, Plaintiff arose without hesitation and without support.  During

the examination the Plaintiff was not wearing or using any collar, brace, or prosthetic device.  The

Plaintiff had normal head carriage.  His shoulders were level, he had a normal cervical and lumbar

lordosis, as well as thoracic kyphosis, and his extremity alignment was equal.  There was no

paraspinal muscle spasm, no trigger points, no supraclavicular fossa problems, no pain to palpation

over the sciatic notch, trochanters, ischial tuberosities, or sacroiliac spine.  Plaintiff's neck flexion

and extension were normal, as was rotation.  His right side bending was to 15 degrees and his left

side bending was to 45 degrees.  Testing of the cervical spine showed no evidence for radiculopathy

or pain.  (R. 111).[4]  Dr. Sczecienski's impression was chronic arthritis of the right knee and chronic

arthritis of the cervical and lumbar spines, as well as a history of right AC separation and a knee

fracture, both of which have healed (R. 115).  The physician noted Plaintiff's history of many other

---

[4]The record of the Plaintiffs visit to Stanley Sczecienski, D.O., also the following: "Orthopedic testing of the cervical spine shows a Spurling maneuver that was negative for any radiculopathy or complaint of pain.  Testing of the lumbar spine shows a negative seated leg extension test.  Schildberg's test is negative and appropriate.  In supine position, the patient had negative straight leg raising and extension.  Hoover's test was negative and appropriate.  Patrick Fabere test is negative.  Neurologic evaluation shows deep tendon reflexes at patella and Achilles.  Biceps and Triceps are +2/4.  The patient had no difficulty with flexion/extension or side bending and rotation against resistance.  Shoulder abduction is negative.  Flexion and extension of the elbows and flexion and extension of the writs is also within normal limits.  Lumbar spine muscle strength testing shows no difficulty with extensor hallucis longus muscle and no difficulty with flexion/extension of the ankle, flexion/extension of the knee, flexion/extension of the hip, as well as abduction and adduction against resistance.  On vascular examination of the skin, the patient showed good texture and color of the skin.  Temperature was good and hair growth was good.  There were no abnormalities on the nails.  The patient was wearing sandals today for observation."  (R. 111 - 112).

injuries, including being thrown through a windshield at age three, and concluded that Plaintiff had

pain due to chronic arthritis, not because of anything related to the June 1999 accident.  (R. 116 -

117).   He believed that the Plaintiff had achieved pre-accident status and had arthritis.  His

functional capacity was as it had been in June 1999, and any further treatment would result from his

longstanding, chronic, degenerative conditions (R. 116-17).

### 3. PLAINTIFF'S FATHER'S TESTIMONY

Plaintiff's father testified that he lived next door to Plaintiff and spends a lot of time with him

(R. 246).  Witness testified that Plaintiff tries to do work for him, but usually overdoes it and "pays

the price."  (R. 246).  Regardless of the type of activity that Plaintiff and he were enjoying or

working on, Plaintiff needed to take a break every hour to change positions or do something else.

(R. 246).  He believed that his son was doing the best that he could, noting that the Plaintiff was

willing to do whatever he could, but that he had extreme physical limitations (R. 247).

### 4. VOCATIONAL EXPERT

ALJ Sheard set out an RFC for sedentary work, with no use of scaffolds "and such" and that

the individual "can't do much in the way of crawling, et cetera" (R. 248 - 49).  Stephanee Leech

served as the vocational expert (the "VE") in this matter (R. 235).  She earlier classified Plaintiff's

past work as medium to heavy and unskilled to semiskilled (R. 93).  The hypothetical posed to VE

Leech by ALJ Sheard was as follows: a man of the Plaintiff's age, education and background who

must be allowed to sit or lie down at lunchtime and use his own hot pack; the job must either involve

the ability to stand and sit at will or provide the opportunity to stand and briefly stretch or have the

majority of the work involve standing up; the individual can seldom climb, balance, stoop, crouch,

kneel, or crawl; he must be kept away from unprotected heights, dangerous moving machinery,

13

automotive equipment, ladders, open water, or open flames; he can lift 10 pounds occasionally; stand one hour and sit eight hours per workday; handling must be limited to frequently.  (R. 250 - 51).

The VE testified that the hypothetical worker was suited for the following unskilled sedentary positions:

> 1,000   information clerk jobs (in the region, 28,500 in the US)
> 2,000   visual inspector (in the state, 66,000 in the US)
> 4,000   assembly positions (in the state, 140,000 jobs in the US)

(R. 251).

VE Leech went on to testify that she thought the information clerk would probably be the best job for the Plaintiff, followed by the visual inspector job, followed by the assembly positions. (R. 253).

The VE and the Plaintiff then had a conversation in which the Plaintiff said that he would need to lie down on an unpredictable basis at least two times a day for 20 minutes each time.  The VE noted that this need would preclude all gainful employment.  (R. 254 - 257).

## 5. ALJ SHEARD'S DECISION

ALJ Sheard found that Plaintiff met the disability insured requirements of the Act through December 31, 2001, and had not engaged in substantial gainful activity since his alleged onset date (R. 15).  He found that the Plaintiff had severe impairments including "degenerative disc disease of the lumbar and cervical spine, degenerative joint disease of the right knee, degenerative joint disease of the shoulders, and carpal tunnel syndrome."  (R. 17).  ALJ Sheard stated that although some of the medical respondents found different ailments that others did not, he believed that they were all reliable, because the doctors were examining the Plaintiff at different times and therefore had access

14

to different evidence and a different set of circumstances than the others. (R. 19). ALJ Sheard did not believe the Plaintiff's allegations regarding his limitations to be fully credible. (R. 21) ALJ Sheard noted that he took the state agency's RFC and reduced it based on the Plaintiff's testimony (R. 19). ALJ Sheard found that the Plaintiff could not perform his past relevant work that had required medium to heavy exertional ability. (R. 20). Yet, he found that although the Plaintiff had limitations that did not allow him to "perform the full range of sedentary work," based on VE Leech's testimony and grid rules 201.27 and 201.28, Plaintiff was not disabled because "there are a significant number of jobs in the national economy that he could perform.' (R. 21).

## II.   ANALYSIS

### A.   Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past

work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.    Factual Analysis:**

Plaintiff raises multiple challenges to the Commissioner's decision: (1) ALJ Sheard should have disregarded the conclusions of Dr. Lele and Dr. Sczecienski; (2) ALJ Sheard gave too much weight to the opinion of Dr. O'Neil; (3) ALJ Sheard should have given controlling weight to the Plaintiff's treating physicians (Drs. Mendelson and Iwanow) and if ALJ Sheard had good cause not to give their opinions controlling weight, he violated 20 CFR § 404.1527(d) by not directly addressing the weight given to their opinions, and further did not comply with the requirement in Section 1527(d) by neglecting to state specific basis in the evidence if a treating physician's opinion is rejected; (4) ALJ Sheard made an error of law by rejecting Plaintiff's treating physicians' determination that Plaintiff was disabled and violated the law by deciding, at least in part, that the Plaintiff was not disabled because the physicians did not regard the disability as "permanent" (R. 19); (5) ALJ Sheard erred when concluding that the medical opinions were not in conflict.

**1. Dr. Lele and Dr. Sczecienski's conclusions should have been disregarded**

---

[5] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

16

Plaintiff argues that Dr. Lele's summary of the medical records available to him suggests that he either did not have access to the vast majority of examinations by Dr. Mendelson or he intentionally disregarded the bulk of Dr. Mendelson's findings and conclusions. Plaintiff also argues that Dr. Lele's review of Dr. Rottenberg's examinations omits and disregards some of Dr. Rottenberg's significant findings. Additionally, Plaintiff argues that Dr. Lele's testimony should be viewed as "suspect from the start" because "Social Security consultative examinations are notoriously superficial and incomplete, and of questionable objectivity." (Plaintiff's Brief, p. 4).

ALJ Sheard examined the opinions and findings of Dr.'s Mendelson and Rottenberg separately from Dr. Lele's report (R. 16, 18, 19). Thus the fact that Dr. Lele did not refer to their findings in full does not mean that ALJ Sheard did not consider their opinions, and therefore even if Dr. Lele did not consider the full record himself, there should be no concern that they have been overlooked by ALJ Sheard. Further, the fact that Dr. Lele did not note all of the Plaintiff's visits to Dr. Mendelson or all of Dr. Rottenberg's findings does not lead to a conclusion that Dr. Lele is biased.

Plaintiff argues that the fact that Dr. Sczecienski was hired by the Plaintiff's automobile insurer coupled with the fact that Dr. Sczecienski concluded that Mr. Jones' injuries were not from his accident but rather from his previous accidents, should have led ALJ Sheard to disregard the absence of positive signs and findings in Dr. Sczecienski's report. Yet, these facts while relevant to the decision of how much weight to give the evidence do not demonstrate as a matter of law that Dr. Sczecienski is so biased that his report should be totally disregarded.

### 2. ALJ Sheard gave too much weight to the opinion of Dr. O'Neil

Plaintiff contends that Dr. O'Neil's opinion was given too much weight considering that his examinations were limited to Plaintiff's left upper arm and the effects of Plaintiff's concussion.

ALJ Sheard's statement that Dr. O'Neil reported a lack of positive signs and findings did not discount other doctor's opinions as to areas he did not examine.  ALJ Sheard never states that he is discounting the opinions of Plaintiff's treating physicians, based on Dr. O'Neil's opinion, rather ALJ Sheard has referred to Dr. O'Neil's examination reports solely to show that the neurological exam was normal and that reflexes and sensation were intact and present (R. 18).  There is no indication that ALJ Sheard used this exam's lack of evidence regarding the Plaintiff's other injuries.  ALJ Sheard clearly evaluated the examinations from the other doctors that were presented to him and made it clear that he understood that the disparities from one doctor's examination to the next was easily explained by the fact that the doctor's were examining the Plaintiff at different times using different means and examining different parts of the Plaintiff based on their particular specialty (R. 19).

### 3. ALJ Sheard should have given more weight to Plaintiff's treating physicians

It is well established that the findings and opinions of treating physicians are entitled to substantial weight.  Older case law in this circuit stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability was binding on the Social Security Administration as a matter of law.[6]  The administrative decision could reject a properly supported treating physician's opinion of disability

---

[6]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

18

if the record contains "substantial evidence to the contrary." *Hardaway v. Sec. of HHS*, 823 F.2d 922, 927 (6th Cir. 1987). Yet, this law has been slightly modified by administrative regulation which gives the Commissioner broader discretion to reject certain treating physician opinions.

In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits. 20 C.F.R. §404.1527 [SSI § 416.927]. While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are more strict than those established by the Sixth Circuit. The 1991 regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.

Under the 1991 regulation, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI § 916.927(d)]. *See also*, S.S.R. 96-2p. In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record.[7]

In the present case ALJ Sheard appropriately considered the findings of Plaintiff's treating physicians even though not giving them "controlling weight." The Plaintiff's thirteen visits to Dr. Mendelson consisted of physical examinations and testing including radiographs, MRIs, ultrasounds

---

[7] These criteria are: (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories; (2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources; (3) the consistency of the opinion with the record as a whole; (4) specialty, with greater weight given to relevant specialists; (5) and other factors which tend to support or contradict the opinion.

*Wallace v. Comm'r. of Soc. Sec.*, 367 F.Supp.2d 1123, 1133 (E.D. Mich. 2005).

and EMGs.  Yet, despite the nature and frequency of the exams, Dr. Mendelson has not examined the Plaintiff since May 2000, making it appropriate for Dr. Mendelson to look to other sources to determine Plaintiff's disability status on his July 2002 applications.  (R. 140 - 162).

While Dr. Mendelson regularly continued Plaintiff in an off-work status, he commonly noted that he would be reevaluated at the next appointment.  These references to 'no work' are quite conclusory, and it is unclear if they refer to any work, or just his past medium to heavy employment. Dr. Iwanow's examined the Plaintiff four times between November 11, 2002, and March 2003.  (R. 217 - 223).  On Plaintiff's last visit, Dr. Iwanow placed him on no work status, "until I can get the functional capacities back and determine what he can or cannot do."  (R. 217).  Again, like Dr. Mendelson, this was a conclusory statement without explanation.  The Plaintiff never returned to Dr. Iwanow.

The Plaintiff mistakes ALJ Sheard's decision that the Plaintiff is able to perform some work with a wholesale rejection of the treating physicians' opinions.  ALJ Sheard states that he found Drs. Mendelson and Iwanow's opinions to be reliable and therefore it cannot be said he rejected them. The fact that ALJ Sheard did not agree with the treating physicians' belief that the Plaintiff was disabled does not necessarily constitute a rejection of their opinions.  The medical/vocational issue of disability is a decision within the discretion of ALJ Sheard.  (20 C.F.R. § 404.1527(e)(1); Workman v. Comm'r of Soc. Sec., 105 Fed. Appx. 794, 800 (6th Cir., 2004) (A treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner.)

### 4. ALJ Sheard erred in rejecting treating physicians' determination of disability

The 1991 regulation limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 404.1527(d)(2), [SSI § 916.927(d)(2)]. Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work. Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

In the present case, Plaintiff argues that ALJ Sheard was to give controlling weight to Drs. Mendelson and Iwanow's recommendation (particularly because there was no "substantial evidence or other basis [in] the record to provide any basis to question [their] opinions") (Plaintiff's Brief, p. 5) that Plaintiff be considered disabled and unable to do any work activity. This is a subject that is left to the discretion of the Commissioner. 20 C.F.R.§ 404.1527(e)(1); *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 800 (6th Cir., 2004) (A treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner.); Wallace, supra, 367 F.Supp.2d at 1133. Therefore ALJ Sheard did properly consider Drs. Mendelson and Iwanow's medical opinions in making his

disability determination but also relied on other evidence in the record[8], ultimately determining that the claimant was not disabled.

The Plaintiff also takes issue with ALJ Sheard's statement that "no treating or examining source found the claimant to be permanently disabled." (Plaintiff's Brief, p. 5 - 6, R. 19). Plaintiff is correct in that such a finding by a treating source is not necessary to find the Plaintiff disabled. Yet it is not in-appropriate for an ALJ to consider this fact. As noted above, Dr. Mendelson never made it clear whether Plaintiff was disabled from any work or just his medium and heavy past jobs. The conclusory statements of Drs. Mendelson and Iwanow are not sufficient to preclude ALJ Sheard from finding that Plaintiff could perform a limited range of sedentary work.

### 5. ALJ Sheard erred in concluding that the medical opinions were not in conflict

Plaintiff argues that the medical opinions are in conflict and therefore that ALJ Sheard erred in concluding that the medical opinions were reliable and not in conflict. Plaintiff believes that the opinions are necessarily in conflict because the Doctors reach different conclusions as to whether or not Plaintiff was able to perform any work.

ALJ Sheard found that the medical opinions were reliable and not in conflict because the examining physicians "were working at different times with different evidence" (R. 19). There is no basis on the record for this Court to reject that finding.

### III.    RECOMMENDATION

---

[8] "[H]aving carefully considered the objective medical evidence and clinical findings of record, the subjective complaints and testimony of the claimant the assessments of treating sources, and the expert vocational testimony provided by Ms. Leech, the evidence shows that the claimant's capacity for sedentary work has not been so significantly compromised as to preclude him from performing a significant number of other jobs in the economy." (ALJ's Decision, p. 6, R. 20).

For the reasons stated above, It is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: November 29, 2005                    s/Steven D. Pepe
Ann Arbor, Michigan                          STEVEN D. PEPE
                                             UNITED STATES MAGISTRATE JUDGE


                              Certificate of Service

        I hereby certify that copies of the above were served upon the attorneys of record by electronic means or U. S. Mail on November 29, 2005.

                                    s/William J. Barkholz
                                    Courtroom Deputy Clerk

23